UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCOTT WOODARD,

    Plaintiff,

v.

COLONEL KRISTE ETUE and
INSPECTOR MICHAEL JOHNSON,

    Defendants.

Case No. 18-12560

Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [52]**

---

In 2016, Michigan State Police (MSP) Lieutenant Scott Woodard accepted an assignment as executive director of the Automobile Theft Prevention Authority (ATPA), an entity that is part of the MSP. In that position, Woodard was responsible for advising and supporting the ATPA board of directors.

In 2018, Woodard was alerted to what he thought was a suspicious $14,000 charge to the ATPA budget. He believed that those funds were being used to benefit the MSP without the approval of the ATPA board. So Woodard informed his supervisor, Michael Johnson, of the charge and told him that he would not participate in any sort of cover-up. True to his word, Woodard soon told two ATPA board members of the charge.

According to Woodard, his superiors—including Johnson—formed a plan to explain to the board that the charge was merely an increase in IT expenses. And at the next board meeting, that is just what they did. Following the board meeting,

Woodard says he was ostracized from his chain of command and accused of being a "leaker."

So on May 14, Woodard sent an email to Johnson and the entire ATPA board, informing them of the charge, controversy, and cover-up and requesting that the MSP and state auditor investigate.

About two weeks later, the MSP relieved Woodard of his duties. And about six weeks after that, two officers in Woodard's chain of command reported him to internal affairs for knowingly making a false accusation in his email to the board.

In August 2018, Woodard filed suit against Johnson and the director of the MSP, Kriste Etue. He believes that his May 14 email was speech protected by the First Amendment and that Johnson and Etue violated his First Amendment rights when they subsequently relieved him of his duties and reported him to internal affairs.

Following discovery, Etue and Johnson filed a motion for summary judgment, arguing, in part, that Woodard's email is not protected by the First Amendment because it was sent in his capacity as a public employee, not as a private citizen. This, they argue, means it cannot be the basis for a retaliation claim. The Court agrees that Woodard sent the email in his capacity as a public employee and GRANTS Defendants' motion for summary judgment.

## I. Background

As Defendants seek summary judgment, the Court accepts as true Woodard's version of events. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### A. Factual Background

After working for many years as an MSP officer, Woodard accepted an assignment as executive director of the ATPA in January 2016. (ECF No. 52-11, PageID.581.)

#### 1. The ATPA

As Woodard explains, the Michigan legislature created the ATPA to assess, prevent, and fund solutions to automobile theft throughout the state. (*See* ECF No. 56, PageID.711 (citing Mich. Comp. Laws § 500.6107).) The ATPA is governed by a seven-member board of directors. Mich. Comp. Laws § 500.6103. The board controls the automobile theft prevention fund, which "must only be used for automobile theft prevention efforts." Mich. Comp. Laws § 500.6107(2), (4). And while the ATPA exercises its powers "independently," it is formally part of the MSP and the MSP director provides staff and administrative support to the board. *See* Mich. Comp. Laws § 500.6103(7).

Accordingly, the ATPA has several MSP support staff, including Woodard. As executive director of the ATPA, Woodard's duties included "advising and providing support functions to [the ATPA's] board of directors." (ECF No. 56-16, PageID.1026.) And Woodard directly supervised Sandra Long, a financial specialist for the MSP who

3

was also assigned to the ATPA. (ECF No. 52, PageID.479; ECF No. 52-11, PageID.583.) Despite this responsibility, Long said that Woodard was very hands-off, explaining that their "meetings would get cut short due to lack of accounting or finance interest/understanding. I would get told . . . 'I'm not a numbers person, you are. Looks good.' . . . It was very frustrating." (ECF No. 52-12, PageID.677.)

And as executive director of the ATPA, Woodard remained in the MSP chain of command. This means that, during the relevant timeframe for this litigation, Woodard reported to Johnson, MSP's assistant commander for grants and community services division. (ECF No. 52, PageID.479; ECF No. 52-11, PageID.584.) Johnson, in turn, reported to Nancy Becker-Bennett, MSP's director for grants and community services division. (ECF No. 52, PageID.479.) Bennett, in turn, reported to Shawn Sible, MSP's deputy director of the administrative support services bureau. (*Id.*) And, finally, Sible reported to Colonel Kriste Etue, the director of the MSP. (*Id.* at Page.ID.479, 484.)

### 2. The $14,000 Charge

In November 2017, Long, the financial specialist who reported to Woodard, was included on an email thread discussing a roughly $14,000 charge for server space that had been allocated to the ATPA. (ECF No. 56, PageID.712; ECF No. 56-2.) The Department of Technology, Management and Budget claimed that the ATPA was responsible for the charge. (ECF No. 56, PageID.712.) But Long replied, "We have verified this is not an ATPA expense. Please do not charge the below amount to our

4

account." (ECF No. 56, PageID.712; ECF No. 56-2, PageID.749.) Nonetheless, it was charged to the ATPA. (ECF No. 56, PageID.712.)

Long told Woodard about the allegedly improper charge in January 2018, as soon as he returned from medical leave. (ECF No. 52-8, PageID.537; ECF No. 52-12, PageID.638.) Woodard promptly informed his supervisor, Johnson. (ECF No. 56, PageID.713; ECF No. 52-12, PageID.640–641.) And Woodard told Johnson, "I am not going to lie about this. I'm not going to cover up the purchase of something from the Board of Directors." (ECF No. 56, PageID.713.)

So, sometime prior to the March 2018 ATPA board meeting, Woodard contacted two members of the ATPA board, including Michael McCabe. (ECF No. 15, PageID.104; ECF No. 52-11, PageID.592–593.) He told them that he believed ATPA funds were being used to benefit the MSP without the knowledge or approval of the board. (ECF No. 15, PageID.104.)

The improper charge was discussed again at an ATPA staff meeting, which was attended by Long, Woodard, and Woodard's entire chain of command (i.e., Johnson, Bennett, Sible, and Etue). (ECF No. 56, PageID.713.) According to Woodard, "they" decided to "explain the purchase of the server as . . . I.T. costs and not to explain any further details." (No. 52-12, PageID.641.) Woodard took this as an implied "cover-up," but stayed quiet out of fear of retribution. (ECF No. 56, PageID.714.)

5

At the March 2018 ATPA board meeting, Long did as she was told. When ATPA Board Member McCabe directly asked about the $14,000 charge, she said that it was "merely the result of increased server charges." (*Id.*; ECF No. 56-3, PageID.783.)

In early April 2019, Johnson and Bennett met with Woodard, and Bennett told him that someone was "leaking information to the board." (ECF No. 52-11, PageID.592.) Woodard, who had in fact spoken to McCabe prior to the board meeting, felt "very uncomfortable." (ECF No. 52-11, PageID.592.)

Following this conversation, Woodard claims that he was "ostracized by his command." (ECF No. 52-11, PageID.593–596.) Woodard claims that his superiors conspired to create a "fantastical" assignment that was "impossible" for him to complete, but otherwise "just . . . stopped talking to [him] altogether." (ECF No. 52-11, PageID.594–595; ECF No. 52-12, PageID.675–676.) However, the ostracization apparently only lasted about a week, as Woodard soon took medical leave. (ECF No. 52-11, PageID.596.)

On May 14, 2018, Woodard sent an email that is the basis for this lawsuit. He emailed his supervisor, Johnson, and the ATPA board to inform them of "the improper expenditure of ATPA funds . . . and the cover up." (ECF No. 56, PageID.718; *see also* ECF No. 52-12, PageID.660.) Specifically, the email said: "I believe that ATPA funds were improperly used to purchase a computer server for the State Police that was not used for ATPA business. . . . I am . . . requesting a full investigation by the State Police and the Office of the Auditor General." (ECF No. 52-12, PageID.660.) In addition, Woodard noted: "I have been accused of being a leaker of information to the

6

ATPA Board. In my capacity as the Executive Director of the ATPA, it is impossible for me to 'leak' information to ATPA Board Members since I report to the Board." (*Id.*) Johnson promptly forwarded the email to the Professional Standards Section for investigation. (ECF No. 52-12, PageID.663.)

About two weeks later, on May 29, 2018, Woodard was relieved of his duties, which he believes was retaliation for sending the May 14 email. (ECF No. 56, PageID.719, 729; ECF No. 52-12, PageID.667.) And Woodard claims that he was the victim of a second act of retaliation: on July 11, Johnson and Bennett—perhaps with the encouragement of Etue's chief of staff—independently emailed internal affairs complaining that Woodard knowingly made false allegations in the May 14 email. (ECF No. 56, PageID.719–720, 729–730.)

But according to Defendants, Woodard was relieved of his duties for two unrelated reasons. (ECF No. 52, PageID.501.) First, Johnson explained that five of Woodard's coworkers expressed concern after Woodard reposted a meme on social media on May 27 that read: "A man reaches a certain age where he doesn't . . . want to fight anymore. And if forced to, he will not fight fair. . . . and there are no weapons he will not use. It's best to leave him alone . . . Don't poke the old men. They will hurt you." (ECF No. 52-2, PageID.670; *see also* ECF No. 56-3, PageID.794 (Long explaining in her deposition: "I thought [the meme] was a threat.").)[1] Second, in February 2018, MSP received a citizen complaint alleging that Woodard had abused his position as

---

[1] In July 2018, an internal affairs investigation concluded that the meme did not violate the department's social media policy. (*See* ECF No. 52-12, PageID.665–669; ECF No. 52-4, PageID.519.)

7

an MSP officer to gain an advantage in a personal custody dispute. (*See* ECF No. 52-11, PageID.607–619.) This allegation led to a criminal investigation, as well as an internal affairs investigation that lasted well into 2020. (ECF No. 52-12, PageID.681, 683.) (Strong evidence suggested that Woodard threatened his wife's ex-husband so he would stop seeking custody of their children.)

In July 2018—just as Woodard's medical leave came to an end—Woodard was suspended with pay. (ECF No. 52-11, PageID.625; ECF No. 52-12, PageID.681.)

And around that time, the MSP adjusted the state accounting system to remove the $14,000 charge from the ATPA's books. (ECF No. 52-12, PageID.681.)

### 3. The Aftermath

Ultimately, Woodard's accusation turned out to be inaccurate. In particular, the Office of the Auditor General concluded that all ATPA expenditures for the relevant timeframe were "appropriate." (ECF No. 52-13, PageID.692.) And an internal affairs investigation concluded that Woodard's allegation was "unfounded," and the investigator believed that Woodard knowingly made a false allegation when he sent the May 14 email. (ECF No. 52-12, PageID.637; ECF No. 52-9, PageID.547–548.) Woodard was eventually removed from his position as executive director of the ATPA, and the MSP filed a statement of charges for his actions in the custody dispute. (ECF No. 52-12, PageID.679, 683; ECF No. 52-11, PageID.629.) Rather than contest the charges, Woodard retired from the MSP with full benefits effective May 2020. (ECF No. 52-11, PageID.607.)

## B. Procedural Background

In August 2018, Woodard filed a complaint against the state of Michigan, the MSP, Etue, and Johnson, alleging one count of retaliation in violation of the First Amendment under 42 U.S.C. § 1983. (ECF No. 1.) In response, Defendants filed a motion to dismiss. (ECF No. 13.) Woodard then filed an amended complaint, but this time against only Etue and Johnson. (ECF No. 15.) Defendants again filed a motion to dismiss, which the Court denied. (ECF Nos. 16, 22.)

Following discovery, Defendants filed a motion for summary judgment, arguing that they were entitled to qualified immunity and that Woodard failed to present a genuine issue of material fact. (ECF No. 52.) Given the clear briefing and record, the Court considers the motion without further argument. *See* E.D. Mich. LR 7.1(f).

## II. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party may discharge its initial summary judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must then determine whether the evidence presents a sufficient factual

9

disagreement to require submission of the challenged claims to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

### III. Analysis

Woodard believes Etue and Johnson violated the First Amendment when they relieved him of his police duties and reported him to internal affairs after he sent the May 14 email. (*See* ECF No. 56, PageID.724–736; *see also* ECF No. 52-11, PageID.624 ("Q: Other than that May 14, 2018 email, are you claiming any other protected or whistleblower activity here? A: No.").)

But to prevail on his First Amendment retaliation claim, Woodard must prove that his speech was constitutionally protected. *See Buddenberg v. Weisdack*, 939 F.3d 732, 739 (6th Cir. 2019). And because Woodard was a public employee, he must do more than a private citizen to overcome that hurdle. *Mayhew v. Town of Smyrna, Tennessee*, 856 F.3d 456, 462 (6th Cir. 2017) ("[B]ecause government offices could not function if every employment decision became a constitutional matter, a public employee's First Amendment rights are narrower than the citizenry at large." (internal quotations and citations omitted)). To prove that his speech is constitutionally protected, Woodard must show that (1) he spoke as a private citizen (2) on a matter of public concern, and (3) that his speech interest outweighs the government's interest, as an employer, in promoting efficient public service through

10

its employees. *See DeCrane v. Eckart*, 12 F.4th 586, 594 (6th Cir. 2021); *DeWyse v. Federspiel*, 831 F. App'x 759, 761 (6th Cir. 2020). And whether an employee engaged in constitutionally protected speech is a question of law. *Mayhew*, 856 F.3d at 463–64.

Etue and Johnson argue, among other things, that Woodard cannot satisfy the first prong of this test because he was speaking as a public employee when he sent the May 14 email. (*See* ECF No. 52, PageID.496–498.) The Court agrees. Because this factor is dispositive, Woodard's speech is not protected, and his claim fails. *See Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 547 (6th Cir. 2007) ("[W]e find no need to definitively resolve th[e] public-concern prong . . . in light of our earlier conclusion that Weisbarth spoke pursuant to her official duties.").

As a preliminary matter, courts are to distinguish "between the government engaging in its own speech (which does not trigger the First Amendment) and the government regulating private speech (which does)." *DeCrane*, 12 F.4th at 595; *see also Lane v. Franks*, 573 U.S. 228, 238–41 (2014) (finding that a community college employee spoke as a private citizen when he testified at a former employee's corruption trial); *Garcetti v. Ceballos*, 547 U.S. 410, 420–23 (2006) (finding that a deputy district attorney spoke as a public employee when he recommended that his supervisors drop a case due to alleged prosecutorial misconduct).

While distinguishing between public employee speech and private citizen speech "can be challenging," the "critical question" is "whether the speech at issue is itself ordinarily within the scope of an employee's duties," not whether it merely

11

concerns those duties. *Mayhew*, 856 F.3d at 464 (citing *Lane*, 573 U.S. at 240). This "inquiry is a practical one." *Id*. And several non-exhaustive factors are relevant, including "the speech's impetus; its setting; its audience; and its general subject matter." *Davidson v. Arlington Cmty. Sch. Bd. of Educ.*, 847 F. App'x 304, 309 (6th Cir. 2021) (quoting *Mayhew*, 856 F.3d at 464–66). Here, each factor supports a finding that the May 14 email was public employee speech.

First, Woodard's responsibilities as executive director of the ATPA were the impetus (or motivation) for the May 14 email. "If an employee speaks to fulfill a job duty, . . . the speech is more likely as a government agent. . . . If, by contrast, the employee speaks to fulfill an unrelated goal, . . . the speech is more likely as a private citizen." *DeCrane*, 12 F.4th at 596 (internal citations omitted); *compare Garcetti*, 547 U.S. 410, 411 (2006) ("Ceballos wrote his disposition memo because that is part of what he was employed to do. He did not act as a citizen by writing it.") *with Lane*, 573 U.S. at 238 ("Sworn testimony in judicial proceedings is a quintessential example of speech as a citizen for a simple reason: Anyone who testifies in court bears an obligation . . . to tell the truth."). And courts should consider both "the duties that the employee actually performs on a day-to-day basis . . . [and] an employee's official duties listed in a formal job description." *DeCrane*, 12 F.4th at 596 (internal citations and quotations omitted).

Here, Woodard's job required him to report to the board. First, Woodard apparently considered informing the board about the improper charge to be part of his job, as the email itself included the following: "In my capacity as the Executive

12

Director of the ATPA, it is impossible for me to 'leak' information to ATPA Board Members since I report to the Board." (ECF No. 52-12, PageID.660.) Second, Woodard's formal job description required him to "advis[e] and provid[e] support functions to a board of directors." (ECF No. 56-16, PageID.1026.) And the email "advis[ed]" the board about an improper use of ATPA funds and subsequent cover-up. *See Mayhew*, 856 F.3d at 464–65 (finding that plaintiff spoke as a public employee, in part, because his job description required him to report accidents to management, and "report to management he did"). This is in line with Sixth Circuit caselaw finding that "most jobs carry with them an inherent duty of internal communication." *Boulton v. Swanson*, 795 F.3d 526, 533 (6th Cir. 2015) (collecting cases). So Woodard sent the email because "that is part of what he was employed to do." *See Garcetti*, 547 U.S. at 411.

In his only argument about the public employee/private citizen distinction, Woodard takes an overly narrow view of his job duties. He says that his position as executive director of the ATPA "did not include an auditing responsibility of ATPA funds; Long, as the financial specialist of the ATPA was responsible for auditing ATPA funds." (ECF No. 56, PageID.727.) But, as Defendants point out, Woodard directly supervised Long, so "her duties and expertise necessarily fell within his supervisory responsibilities." (ECF No. 59, PageID.1033.) And even accepting Woodard's claim that Long was responsible for auditing ATPA funds, his point is not relevant. Woodard claims that his constitutionally protected speech was the "May 14, 2018 statement regarding the improper expenditure of ATPA funds for MSP server

13

space and Defendants attempt to cover it up," not the auditing of ATPA funds. (ECF No. 56, PageID.725.) So while Long may have brought the improper charge to Woodard's attention, he was the one who informed the board about it, which led to the alleged retaliation and First Amendment violation. Woodard makes no argument that the auditing itself was protected activity, and the Court does not see why it would be on the current record.

The email's setting and audience compel the same conclusion. "On-the-clock speech at the employer's place of business is more likely to be speech as a government agent as compared to off-the-clock speech away from the office . . . [and] [s]peech to supervisors is more likely to be speech as a government agent as compared to speech to outside individuals." *DeCrane*, 12 F.4th at 596. Though Woodard was on medical leave when he sent the email, it was sent from his MSP email address using his official ATPA title, sent only to his supervisor and members of the board that he reported to, and informed the recipients of an improper use of funds that they oversaw. *See Holbrook v. Dumas*, 658 F. App'x 280, 288 (6th Cir. 2016) (finding that plaintiff spoke as a public employee when he "sent the e-mail as Fire Chief, from his official e-mail account, to fire department employees, informing them of a development potentially affecting their employment"). So the setting and audience of the email support a finding that he spoke as a public employee.

Finally, the subject matter of the email also shows that Woodard acted pursuant to his official duties. The email details Woodard's initial meeting with two board members, the meeting with his chain of command where they decided to "cover-

14

up" the improper charges, the board meeting where Long avoided telling the board about the controversy, and Woodard's subsequent ostracization after he was accused of being a "leaker." (ECF No. 52-12, PageID.660.) Moreover, as Defendants point out, the remedy sought was "a full investigation by the State Police and the Office of the Auditor General into the improper usage of ATPA monies by the State Police." (*Id.;* ECF No. 52, PageID.497.) So the email covered exclusively on-the-job conversations and meetings, addressed Woodard's supervisor and the board he reported to, and requested relief from the MSP and the state, Woodard's employers. Thus, the subject matter of the email also shows that it was within Woodard's ordinary duties.

In sum, each factor weighs in favor of finding that Woodard sent the May 14 email in his capacity as a public employee. And "when public employees make statements pursuant to their official duties . . . the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Indeed, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 422.

15

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 52) is GRANTED. A separate judgment will follow.

SO ORDERED.

Dated: January 11, 2022

                                            s/Laurie J. Michelson
                                            LAURIE J. MICHELSON
                                            UNITED STATES DISTRICT JUDGE